In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1924

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN E. WHITING,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 21—**Rudolph T. Randa**, *Chief Judge.*

ARGUED SEPTEMBER 25, 2006—DECIDED DECEMBER 15, 2006

Before BAUER, KANNE, and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Steven E. Whiting of converting funds withdrawn from employee paychecks and making a series of false statements relating to health care matters at two companies, Badger Die Casting, Inc. and Western Rubber, Inc., in violation of 18 U.S.C. §§ 664, 669, and 1035. The funds were intended for payment of health insurance premiums, self-funded health benefit programs, and a 401(k) fund. Whiting was sentenced to 90 months of incarceration, three years of supervised release, and ordered to pay $922,875.44 in restitution. On appeal, Whiting asserts that the district court erred in (1) concluding that the relationship between Whiting and the employee benefit plans could

support a conversion action; (2) finding that the evidence was sufficient to support Whiting's convictions for conversion; (3) admitting evidence of his wealth; and (4) calculating his sentence. We affirm the conviction and reverse for resentence.

## I.  Background

### A.  Badger Die Casting

In 1998, Steven Whiting purchased Badger Die Casting with financing from LaSalle National Bank and a series of promissory notes from the former owners. Badger's employees were members of the United Electrical, Radio & Machine Workers of America. Their collective bargaining agreement required that Badger provide health insurance to employees but also allowed Badger to self-fund the plan with notice to the employees.

#### 1.  Health Insurance

Initially, Badger employees were covered by a United Healthcare insurance policy that was funded in part by employee payroll deductions. Employee contributions were withheld from paychecks and kept in Badger's general operating account until they were used to pay the United Healthcare premium.

By October 2000, the company was in financial distress and behind in payments to vendors, service providers, and utility companies. In June 2001, Badger withheld $6,134.00 from employee paychecks intended for the payment of the June health insurance premium. Although these funds were deducted, Whiting defaulted on the United Healthcare premium for June. As a result, United Healthcare terminated the policy.

In June 2001, Whiting decided to institute a self-funded medical plan for Badger, as well as two other companies that he owned: Western Rubber, Inc. and GAC Plastics. To administer the self-funded plan, Whiting entered into a contract with Medical Benefits Administrator ("MBA"). MBA was not an insurance company; it processed claims and provided stop-loss insurance coverage for medical claims in excess of $30,000.

When Whiting decided to switch the company to self-funded insurance, he instructed the Human Resources Director, Teresa Palkowski, to post a notice at the company. Palkowski's initial draft referred to MBA as the new "plan administrator," but Whiting told her to use the term "insurance carrier" because "administrator" could be a "red flag." In late June, Palkowski posted a notice describing MBA as "our new health insurance carrier." Whiting further instructed Palkowski to depart from Badger's past practice of holding a group presentation on a new plan and, instead, have MBA enroll employees in the plan in groups of one or two. In March 2002, Badger first gave official notice to the employees that the plan was self-funded.

Although the self-funded plan was effective July 1, 2001, due to processing delays medical claims were not presented to Badger for approval until late September 2001. Whiting did not give Palkowski permission to authorize MBA to pay medical bills; he only approved the payment of prescription expenses.

On April 15, 2002, LaSalle National Bank foreclosed on Badger's assets. On May 1, 2002, MBA sent a termination letter to Badger employees and directed them to send all unfunded medical claims directly to Whiting. As a result, Badger employees were left with $414,775 in unpaid medical claims.

### 2. 401(k) Plan

Badger employees also participated in a 401(k) savings plan. Pursuant to the 401(k) plan, Badger initially withheld employee contributions and matched a percentage. Employee funds were then forwarded to Strong Funds for investment, on a monthly basis. Whiting had final authority on all checks; he decided whether to forward employee funds to Strong Funds.

In late 2001 and early 2002, Badger did not fund its 401(k) plan. The 401(k) contributions withheld from employee paychecks were $7,163.00 for December 2001; $7,379.00 for January 2002; $2,460.00 for February 2002; $3,011.00 for March 2002; and $739.00 for April 2002. Badger deducted these 401(k) contributions but failed to forward them to Strong Funds. In accordance with Whiting's instructions, the employee funds remained in Badger's operating account and were not paid to Strong Funds.

### 3. Wealth Evidence

Although Whiting spent no more than six to eight hours a week at Badger reviewing aging accounts payable, determining which checks to pay, and dealing with human resource issues, he withdrew approximately $798,000 in management fees and expenses. He also withdrew another $676,000 in miscellaneous expenses related to, among other things, equipment leases paid to entities that he controlled.

Through his management company, the Garrett Group, LLC, Whiting received management fees and expenses from Badger. His initial monthly management fee was $10,000, which was thereafter increased to $40,000, and finally reduced to $20,000. In 1999, 2000, and 2001, Whiting withdrew $311,169.70, $314,781.51, and

$94,099.84, respectively. Around the time that Whiting defaulted on the United Healthcare premium for June, he directed his controller to pay him $20,126.00. Notably, in 1999, the Garrett Group purchased a $1.3 million airplane. Badger had out-of-state customers, but Whiting's trips to see them were "very, very seldom."

Whiting alone directed which checks were written. Although Whiting's management fees were paid on a monthly basis, all other accounts were aged as long as possible.

### B.  Western Rubber, Inc.

In November of 1997, Whiting acquired the assets of Western Consolidated Technologies with financing from LaSalle National Bank and renamed the company Western Rubber, Inc. Western employees were members of the United Steel Workers of America. Their collective bargaining agreement required that Western provide health insurance for covered employees.

### 1.  Health Insurance

Western provided health insurance to its employees first through Humana and then through Trustmark Insurance Company. Western withheld $5,620.00 from employee paychecks intended for payment of the June 2001 premium. Although these funds were deducted, Western defaulted on the June premium. As a result, Trustmark terminated its coverage of Western and did not pay any doctor or hospital claims for the month of June.

In June 2001, Whiting instituted a self-funded health plan and hired MBA as the administrator. Western continued to deduct funds from the employees' paychecks, since the company "intended to continue to provide the

same coverage, and insurance benefits, that were always provided in the past." Western informed its employees and the union of this change and instructed them to bring their medical bills to the company for payment.

The company's controller, Allen DeSomer, cautioned Whiting about the risks, given the older ages of the employees, and specifically advised him that an employee, Dale Garber, had been diagnosed with cancer. Whiting told DeSomer that self-funding was "working well" at Badger, and he did not believe monthly health care costs for cancer treatment would exceed $10,000. General manager Phil Hamilton also advised Whiting of Garber's situation and recommended that a separate insurance policy be taken out to cover his medical expenses. Whiting represented that he had a plan to provide funding for Garber's cancer treatments. Despite the concerns expressed by DeSomer and Hamilton, Whiting implemented the self-funded plan and did not take out a separate insurance policy for Garber.

Western processed the medical claims for the months of June, July, and August. During these months, DeSomer could not write checks for employee medical claims without Whiting's approval. In September 2001, Western hired MBA to administer its plan, which, like the one at Badger, included a stop-loss insurance policy. MBA began to administer the self-funded plan in September, but all checks and medical claims still needed Whiting's approval.

In February 2002, Whiting directed DeSomer to limit expenses to raw materials only and to notify the employees that Western was closing its doors. The employees were left with $375,530 in unpaid medical claims.

### 2. Wealth Evidence

Generally, Whiting would visit Western once a month and review financials with the controller. During his

ownership of Western, Whiting withdrew approximately $756,000 in management fees and expenses. His monthly management fees were $20,000 in 1999 and 2000. In 2001, he reduced his fees but continued to receive payments for the airplane and rent. Although Western was late paying its May Trustmark premium and failed to pay its June Trustmark premium, it promptly paid Whiting's monthly airplane expense of approximately $4,100 in May, June, and July.

Throughout this time period, Western made rent payments to WRA Holdings, an entity that Whiting controlled, and Whiting, in turn, made mortgage payments to LaSalle National Bank. Whiting charged Western monthly rent of $10,000 in 1998, $12,000 in 1999 and 2000, and later reduced the monthly rent to $9,000 and $8,000 for 2001, even though the monthly mortgage owed to the bank was only $6,000. Over the course of Whiting's ownership, Western paid WRA Holdings approximately $457,000 in rent. WRA Holdings, in turn, paid management fees to Whiting.

In the summer and fall of 2001, Whiting directed what bills the company paid. Specifically, Whiting instructed the company's controller to overnight his management fees and expenses and to delay paying other creditors. At one point when Western had received payment from some customers, DeSomer e-mailed Phil Hamilton, the general manager, and asked how they could keep Whiting from withdrawing the aforementioned management fees. In response, Hamilton joked, "Not tell him about it, huh?"

## C. District Court Proceedings

In September 2004, Whiting was indicted on thirteen counts of violating Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). Counts one

through three charged Whiting with violating 18 U.S.C. § 644: count one charged Whiting with converting approximately $6,134.00 deducted from paychecks of Badger employees that was intended for the June 2001 health insurance premium; count two charged Whiting with converting approximately $6,761.00 deducted from paychecks of Badger employees that was intended for the July 2001 health insurance premium; count three charged Whiting with converting $5,620.00 funds from paychecks of Western employees that was intended for the June 2001 health insurance premium. Count four charged Whiting with violating 18 U.S.C. § 669 by knowingly converting and misapplying funds deducted from employee paychecks for a health care benefit program as defined 18 U.S.C. § 24(b). Counts five through nine charged Whiting with converting $7,163.00 for December 2001; $7,379.00 for January 2002; $2,460.00 for February 2002; $3,011.00 for March 2002; and $739.00 for April 2002 intended for the Badger 401(k) plan. Counts ten through thirteen charged Whiting with violating 18 U.S.C. § 1035 by knowingly and willfully making materially false statements and representations involving a health care benefit program as defined in 18 U.S.C. § 24(a). Specifically, count ten charged Whiting of misrepresenting that MBA was Badger's new health insurance carrier; count eleven charged Whiting of misrepresenting that Badger would change insurance carriers from United Healthcare to MBA; count twelve charged that Whiting misrepresented that Badger had a continuing schedule in place for catching up with medical claims; and count thirteen charged that Whiting misrepresented that he had a plan to provide funding for cancer treatments of a Western employee.

### 1. Motion to Dismiss

Whiting moved for dismissal of counts one through three and five through nine, arguing that the indictment did not state a cause of action because the collective bargaining agreements did not support an action for conversion. The district court rejected Whiting's argument and found that once deducted from employee paychecks, employee contributions are plan assets for the purposes of 18 U.S.C. § 664. The district court held that Whiting's motion to dismiss "in essence, challenges the government's ability to prove that Whiting converted the employee assets of a plan subject to ERISA" and "that issue must await trial."

### 2. Jury Instruction

Prior to trial, Whiting requested a jury instruction that the jury must "look to any agreements between the parties and the rights and obligations created by those agreements" to determine whether employee contributions are plan assets under ERISA. Whiting further requested an instruction that "when a party is allowed to commingle funds, he holds money merely as a debtor to the other party and can not be guilty of conversion of those funds, unless the parties have an agreement that indicates otherwise."[1] The district court declined the

---

[1] The following is the complete jury instruction relating to conversion of plan assets that Whiting requested: "Conversion must involve the property of another, not the property of the defendant. In this case, funds were deducted from paychecks of employees at Badger Die Casting and Western Rubber to pay the employee contribution for the health insurance premium. This money was placed into the general operating account of the company. An employer is not required to create a separate account for this money. To determine whether this money was

(continued...)

above instruction, holding that this information was irrelevant.

At the close of the trial, the district court judge instructed the jury that in order to find the defendant guilty of converting funds intended for payment of health insurance premiums and the 401(k) plan, the government must establish beyond a reasonable doubt that (1) the defendant converted funds to his own use or the use of another; (2) the funds were assets of an employee pension benefit plan subject to ERISA; and (3) the defendant acted willfully and with fraudulent intent. The judge further instructed the jury that

> plan assets include amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets, but in no event shall that date occur later than 90 days from the date on which such amounts would otherwise have been payable to the participant in cash (in the case of amounts withheld by an employer from a participant's wages). (quotations and ellipses omitted).

---

[1] (...continued)
the asset of an employee welfare benefit plan, as opposed to the asset of the company, you must look to any agreements between the parties and the rights and obligations created by those agreements.

When a party is allowed to commingle funds, he holds money merely as a debtor to the other party and can not be guilty of conversion of those funds, unless the parties have an agreement that indicates otherwise."

### 3. Wealth Evidence

Whiting also moved *in limine* to bar evidence of his wealth. The government argued that this evidence was probative of Whiting's willfulness and intent to defraud. Whiting countered that the wealth evidence was too prejudicial. The district court, in denying the motion, agreed with the government that Whiting's wealth was relevant on the issue of his intent. At trial, evidence of Whiting's management fees, expense reimbursements, and personal expenditures was introduced. Such evidence included a $135,195 recreational vehicle Whiting purchased in June 1999; a $1.1 million home in Brookfield, Wisconsin; a vacation home in Florida with a market value of $1.6 million in November 2004; and a $1.3 million dollar airplane.

### 4. Verdict and Sentencing

On May 23, 2005, a jury acquitted Whiting on counts two, eleven, and twelve and found him guilty on the remaining ten counts. At sentencing, the district court applied a base offense level of 6, and then increased the sentence by the size of applicable loss. As part of this figure, the district court applied the total unpaid claims to Whiting's figure because employees had trusted Whiting to take care of their health care. The district court sentenced Whiting to 90 months of incarceration, three years of supervised release, and ordered him to pay $922,875.44 in restitution. Whiting timely filed this appeal.

## II. Discussion

### A. ERISA Plan Assets

Whiting asserts that the funds deducted from employee paychecks were not ERISA plan assets based on the terms

of the collective bargaining agreements. Whiting contends that the relationship between himself and the employee benefit plans could not support a conversion action. He asserts that the collective bargaining agreements establish that he was a debtor and not a bailee, and as a debtor he cannot be liable for conversion; at most he merely failed to satisfy a contractual debt. Whiting also argues that the employees had a future interest in the funds, while a possessory interest would be required to support a conversion charge. He asserts that the employees do not have a present interest in the unpaid contributions until they are actually paid to the plan, which never occurred. In sum, Whiting contends that because he was never required to segregate the funds and never delivered the funds to the intended recipient, the funds never became "plan assets" that could have been converted. As such, Whiting challenges the district court's denial of his motion to dismiss and denial of Whiting's jury instruction on the definition of plan assets.

To determine whether an employer can avoid criminal liability by never applying employee payroll funds to the ERISA plans to which they were intended, we must consider the meaning of ERISA plan assets. Under 18 U.S.C. § 664,

> any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

> As used in this section, the term "any employee welfare benefit plan or employee pension benefit

plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.

*Id.*

ERISA does not define what constitutes "plan assets" of an ERISA fund. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 89,114 S. Ct. 517, 126 L. Ed. 2d 524 (1993). Despite the absent of a definition, the term "plan assets" appears throughout the statute. "Plan assets" are required to be held in trust, 29 U.S.C. § 1103(a), to be used for the exclusive benefit of participants and beneficiaries, § 1103(c)(1), and to be allocated among participants and beneficiaries upon termination of the plan, § 1344(a). According to a Department of Labor Regulation, plan assets "include amounts . . . that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." 29 C.F.R. § 2510.3-102(a). According to this regulation, the earliest date is "the date on which such amounts would otherwise have been payable to the participant in cash (in the case of amounts withheld by an employer from a participant's wages)." § 2510.3-102(c).

Other circuits have defined the term "plan assets" to include funds withdrawn from employee checks before they are deposited into benefit plans. *Bannistor v. Ullman*, 287 F.3d 394, 402 (5th Cir. 2002) (defining ERISA plan assets to include contributions withheld from employee paychecks and for deposit into their benefit plans, even though the contributions have not actually been delivered to the benefit plan); *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991) (holding that employee contributions are plan assets even if they have not been delivered to the plan); *United States v. LaBarbara*, 129 F.3d 81, 88

(2nd Cir. 1997) (holding that once wages were paid, defendant had contractual obligations to the fund that constituted assets by any common definition); *Navarre v. Luna*, 406 F.3d 1192, 1200 (10th Cir. 2005) (agreeing with the reasoning and outcome in *LaBarbara*). In line with this authority, we find that unremitted employee contributions, including employee contributions withheld from employee paychecks that have not been delivered to their intended benefit plans, can be plan assets for the purposes of § 664 of ERISA.

The funds withdrawn from employee paychecks represent an amount of money paid to employees in compensation. Once the contributions are withheld, the money no longer belongs to the company; rather, the funds belong to the employees. Therefore, employees have a present interest in the funds. In this case, the funds were withdrawn for payment of insurance premiums and 401(k) plans. By leaving the employee payroll deductions in the general operating account, Whiting directed those funds to be used for purposes other than they were intended. Diverting money earmarked for an intended recipient and keeping it in your own pocket is conversion.

In challenging the jury instruction given by the district court, Whiting claims that as a matter of law, the district court failed to properly instruct the jury on conversion of plan assets because it did not direct the jury to consider the collective bargaining agreements. Whiting's argument is that to determine whether the specified funds were plan assets that were converted, the jury must be instructed to consider the Badger and Western collective bargaining agreements.

Although Whiting states that the district court refused to acknowledge the collective bargaining agreements, the district court's pretrial and trial rulings did not preclude Whiting from arguing to the jury that the collective

bargaining agreements did not make him responsible for the employee funds. In fact, the collective bargaining agreements were admitted into evidence. Additionally, there was no dispute that the deductions made from paychecks were employee contributions to the plan. The jury did not need a specific instruction to establish the relationship between Whiting and his employees.

**B.  Insufficiency of Evidence**

In weighing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and will reverse a conviction only if no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Peters*, 277 F.3d 963, 967 (7th Cir. 2002).

The jury convicted Whiting with violating ERISA § 664 by converting $6,134.00 of funds intended for the June 2001 health insurance premium at Badger. Section 664 imposes liability when a person converts to his own use or to the use of another funds of an employee welfare benefit plan. 18 U.S.C. § 664. Whiting challenges the sufficiency of the evidence to support this conviction by claiming that there is no evidence in the record regarding Whiting's use of employee payroll deductions. However, the evidence conclusively showed that employee contributions were deducted from Badger employee paychecks and the June health insurance premium was never paid. During this time, Whiting enriched himself with promptly paid management fees and expenses. A rational fact finder could conclude that this violated § 644. Thus, the evidence was sufficient to show that Whiting did not use the $6,134 charged in count one for payment of the June 2001 United Health care premium at Badger. A rational jury could find that this money was converted.

The jury also convicted Whiting of converting employee 401(k) contributions for December 2001 through April 2002. Whiting argues that the evidence was insufficient to support this verdict because there was no evidence that he used the employee 401(k) contributions; rather, the funds remained in Badger's general operating account. Failure to use funds in accordance with Whiting's obligation supports a conversion conviction under § 664. The evidence at trial established that Whiting had a duty to fund the 401(k) plans. Badger's controller testified that the employee funds were not paid to the 401(k) because Whiting never directed that the payments be made. The jury properly rejected Whiting's defense that LaSalle restricted Whiting expenditures because none of the checks LaSalle rejected were destined for the 401(k) fund. The jury also heard evidence that Whiting enriched himself with promptly paid management fees and expenses during this time. A rational fact finder could conclude that this violated § 644. Accordingly, the evidence was sufficient to support the jury's findings.

## C.  Wealth Evidence

Whiting directs his third challenge to the district court's admission of Whiting's management fees, expense reimbursements, and personal expenditures. The district court admitted this evidence under Federal Rule of Evidence 404(b) for the purpose of showing Whiting's willfulness and intent for engaging in the fraudulent scheme. We review the district court's evidentiary rulings for an abuse of discretion, *United States v. Thomas*, 453 F.3d 838, 844 (7th Cir. 2006), and will reverse only where no reasonable person would agree with the decision made by the trial court. *Id.* at 845.

Whiting first asserts that the district court abused its discretion in admitting irrelevant evidence of his financial

condition. Whiting argues that the evidence was irrelevant because the government could not prove that the specific dollars in the conversion counts were used to pay Whiting's fees or expenses. Evidence is relevant where it has the tendency to make the existence of any fact of consequence either more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. As part of its case in chief, the government was required to prove that Whiting acted willfully and with fraudulent intent. We often have held that "when a defendant is charged with a specific intent crime, the government may present other acts evidence to prove intent." *United States v. Curry*, 79 F.3d 1489, 1495 (7th Cir. 1996). The evidence of Whiting's wealth shows that over a two to three year period after acquiring Badger and Western, Whiting willfully withdrew significant amounts of money in management fees and related expenses, such that there were insufficient funds to cover health care and 401(k) obligations. This evidence was relevant to Whiting's intent to defraud.

Citing Federal Rule of Evidence 403, Whiting asserts that the probative value of the evidence was substantially outweighed by its prejudicial effect, which was aggravated by the government's improper use of the evidence. Whiting suggests that the government's purpose in presenting this evidence was to trigger an emotional reaction by the jury through painting Whiting as a wealthy individual. We disagree. Evidence of Whiting's wealth shows the manner in which he directed company funds to be spent. This evidence is highly probative of his intent to defraud his companies. In fact, this seems to be the only evidence that illustrates Whiting's intent. *See United States v. Mobley*, 193 F.3d 492, 496 (7th Cir. 1999) (putting money to questionable ends cannot prevent the prosecutor from making an otherwise proper demonstration of motive and effect.) Moreover, the prejudicial effect

of the wealth evidence was not great, considering this was a criminal prosecution, not a civil lawsuit seeking money damages. The district court did not abuse its discretion in admitting this evidence.

### D. Sentencing

Finally, Whiting attacks the calculation of his sentence. Whiting asserts that the district court erred in determining that Whiting caused $921,380 in loss. We agree. When imposing a sentence, a district court must first calculate the advisory guideline range and then select a sentence within or outside the range in light of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Robinson*, 435 F.3d 699, 700-01 (7th Cir. 2006). In the post-*Booker* era, this Court continues to review the district court's application of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005).

U.S. Sentencing Guidelines Manual § 2B1.1 assigns a base offense level of 6 and then requires, in § 2B1.1(b)(1), that the offense level be increased by the size of applicable "loss." Application Note 3 defines how "loss" is determined. "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S. Sentencing Guidelines Manual § 2B1.1, Application Note 3(a)(i). Reasonable foreseeable pecuniary harm is "pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." U.S. Sentencing Guidelines Manual § 2B1.1, Application Note 3(a)(iv). Causation includes two distinct principles, cause in fact, commonly known as "but for" causation, and legal causation. Whiting challenges the district court's calculation of "actual loss."

The jury convicted Whiting of converting $66,117, but the district court based his Sentencing Guidelines range on

a loss figure of $921,380.[2] The district court reasoned that Whiting's misrepresentations, charged in counts ten and thirteen, caused the total loss of all unpaid medical claims. To determine this loss figure, the district court correctly applied the standard of whether the losses were "reasonably foreseeable pecuniary harm" and acknowledged that Note 3(a) required a finding that the false statements were a cause-in-fact of the loss. The court then conceded that the statement that MBA was a "carrier" "is not really causal of losses relative to the unpaid medical claims" and stated that "there isn't strict causal—and I think the defense focused too much on cause." Nonetheless, the district court applied the unpaid claims to Whiting's loss figure because the employees had trusted Whiting to provide health care. We find that the district court improperly applied the loss causation standard by finding both no causation and causation.

## III.  Conclusion

Based on the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for new sentencing consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[2]  The judgment reflects a corrected amount of $922,875.44.