In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 19-1176

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROY COLLINS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 16-20059 — **James E. Shadid**, *Judge*.

———————————

ARGUED JANUARY 9, 2020 — DECIDED FEBRUARY 11, 2020

———————————

Before WOOD, *Chief Judge*, and EASTERBROOK and BARRETT, *Circuit Judges*.

WOOD, *Chief Judge*. From 2011 through 2016, Roy Collins was the executive director of the Kankakee Valley Park District ("the Park District"), which is a municipal entity that serves residents of Aroma Park and Kankakee Townships, Illinois. The Park District, which is not tax-exempt, works with the Kankakee Valley Park Foundation ("the Foundation"), which does have tax-exempt status and raises funds for Park

District programs. Collins served as treasurer for the Foundation. He proved to be a bad choice for both posts: eventually it came to light that he had been lining his own pockets with the Park District and Foundation's money. Federal prosecution for mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 followed. Collins pleaded guilty to both counts and was sentenced to concurrent terms of 42 months' imprisonment, two-year terms of supervised release, and overall restitution of $194,383.51. On appeal he has raised several challenges to that sentence, but we are satisfied that there is no reversible error and thus affirm the district court's judgment.

**I**

Collins did not restrict himself to one type of misconduct during his time with the Park District. Some of his misdeeds involved using Park District resources for his personal benefit; some involved misuse of a Park District credit card; at times he orchestrated kick-back arrangements with vendors; and when all else failed he simply stole cash. Finally, at one point he arranged for a loan of $25,115 from Municipal Trust and Savings Bank; he needed those funds because the budget was strained as a result of his other actions. We summarize only the high points here.

*Use of Park District resources for personal benefit.* In 2015 Collins decided to build a fishing pond on his personal property. He drew on Park District employees, Park District equipment, and the Park District's bank account to do so. At least one Park District employee received overtime pay for his work on Collins's fishing pond—work that was also performed during regular hours and covered by his regular salary. The builders used Park District equipment. Collins wrote Park District

checks to purchase a pond liner, to pay for the water to fill the pond, and to have construction debris hauled away.

Apart from the pond, Collins helped himself to other Park District equipment, notably a riding lawnmower called a Dixie Chopper and a golf cart. A local business had donated the Dixie Chopper to the Park District in 2013 in exchange for some advertising, but Collins moved the mower to his house, from which it was recovered in 2016 in poor condition. Similarly, he purchased a golf cart for the Park District in 2013 but kept it at his home for personal use until late 2015 or so, when he returned it in deteriorated condition.

*Misuse of Park District credit card.* The Park District gave Collins a credit card for incidental business expenditures, but Collins used it as his own. He took steps to cover up his dishonesty by submitting summaries of his bills to the district's board rather than the actual monthly statements. One board member questioned this at one point but did not follow up. Between 2012 and 2014, Collins concealed from the board approximately $42,600 in purchases. In April 2015, he charged $3,228 to the card for a "Tranquility Remote Controlled Pond Fountain" and accessories. On another occasion in 2013, he used the card to buy a pair of western-style boots for $234. After these purchases, he paid the bill by mail.

*Kickbacks.* During the fall of 2013 and spring of 2014, while planning the Park District's 2014 Barbeque Fest, Collins hired his friend Shaun Szymborski to serve as a liaison for musical acts. Part of the deal, however, was a secret provision under which Szymborski would kick back a portion of the fee Szymborski earned from the Foundation for his services. True to form, after Collins paid Szymborski $7,500 on March 31, 2014, Szymborski sent a check back to Collins for $2,500. A

similar exchange of payments happened when Collins paid Szymborski for the balance of his fees after the 2014 Fest was over, and Szymborski turned back $500 to Collins. And the pattern continued when Collins turned his attention to the 2015 Barbeque Fest.

*Thefts of cash*. The government estimated that Collins stole more than $50,000 in cash ticket receipts during the 2015 Barbeque Fest. A company called D and J Amusements was in charge of monitoring the number of people who passed through the gates. It did so using a clicker, and its fee was based on the number of people it counted. The evidence showed that D and J was paid $24,053, which is the amount that corresponds to 9,453 attendees in 2015. Yet Collins's Fest summary listed only 6,870 tickets sold—a difference of more than 2,500. The average price of the tickets was $18 ($15 for Thursday, $20 for Friday and Saturday, and $35 for VIPs). It thus appears that there was about $46,500 in lost revenue—less than the government thought but still significant. To reach the government's number, one need only take Collins's own estimate, which was that 9,900 tickets were sold. If that were the number, then 3,030 tickets were unaccounted for, representing $54,540 in lost revenue at an average ticket price of $18. The government noted that following the 2015 Fest, "Collins had been in charge of transporting tubs of cash with ticket sale money." Br. of Appellee at 8. Collins also skimmed off cash payments that were supposed to go to musical groups and other vendors.

*Municipal Bank loan.* The bank decided that it would make this loan only if the Park District or Foundation would pledge repayment from the anticipated receipts of the 2016 Barbeque Fest. Collins agreed to do so, but he did not tell the bank that

some vendors from the 2015 Fest still needed to be paid, and that any 2016 profits were already spoken for. The bank wound up writing off the loan as a total loss.

## II

The details of the government's investigation into Collins's activities need not detain us. It suffices to say that people started noticing that the numbers were not adding up, that all signs pointed to Collins, and that his federal indictment eventually followed. Count I charged mail fraud in connection with his issuance of a Foundation check to purchase the pond liner for his property, and Count II charged wire fraud in connection with his use of the Park District credit card to buy the western boots. In September 2017 he entered an open plea of guilty to both counts; along with the plea, he filed a declaration acknowledging his guilt and admitting a significant amount of relevant conduct beyond the specifics listed in the indictment. The district court (at the time, Judge Bruce) held a two-day hearing in early 2018 to resolve various disputed issues of fact, including the amount of loss.

Later that year, Collins moved to dismiss the indictment based on alleged errors before the grand jury, or in the alternative to withdraw his guilty plea. The district court (by now Judge Shadid, to whom the case had been transferred) denied those motions and scheduled another sentencing hearing for January 11, 2019. The Probation Office's Third Revised Presentence Report (PSR) found that his conduct had resulted in a loss of $190,540.30 in the aggregate; the report indicated that Collins was responsible for restitution of $165,540.30 to the Park District and the Foundation, and $25,000 to the bank. At the hearing, Collins objected to those calculations and urged that he owed at most $31,856. The court found that

Collins's advisory sentencing range was 57 to 71 months and chose below-range concurrent sentences of 42 months on both counts, to be followed by two years of supervised release. It did not, however, come to a final decision on restitution, and so the initial judgment entered on January 15, 2019, did not contain an order of restitution. Instead, in all capital letters, under the heading "Restitution" it says "RESERVED." After receiving additional briefs, the court issued an Amended Judgment on February 27, 2019, thereby resolving the restitution portion of the judgment. It imposed a total of $194,383.51 in restitution—$163,130.30 for the Park District or the Foundation, and $31,253.21 for the bank.

Collins filed only one Notice of Appeal, from the district court's January 15 judgment; this Notice was received January 25, 2019. Notably, he did not file a Notice of Appeal from the Amended Judgment, which was the only one that reflected his restitution obligations. Those decisions turn out to have consequences for our review, as we explain below.

### III

Of the four issues Collins raises on appeal, two relate to the district court's decisions with respect to his advisory Sentencing Guidelines range, and two relate to the restitution order. We address the guidelines issues first, as they are properly encompassed within the January 25 Notice of Appeal.

### A. Loss Amount

His primary argument is that the district court erred when it increased his base offense by ten levels pursuant to U.S.S.G.

§ 2B1.1(b)(1)(F), because (he asserts) its calculation of actual loss was incorrect.[1]

This is a factual question for which the standard of review is clear error. That guideline pegs the base offense level to the loss associated with the crime, and it defines the term "loss" to mean "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A) ("General Rule"). It then defines "actual loss" to mean "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). Something is reasonably foreseeable if "the defendant knew or, under the circumstances, reasonably should have known," that the pecuniary harm "was a potential result of the offense." *Id.* cmt. n.3(A)(iv).

Collins attacks the district court's decision to include the following items in its loss calculation: (1) $42,604.30 in missing funds in unreported credit-card charges; (2) $54,899 missing from the 2015 Barbeque Fest ticket sales; (3) $25,590 that was diverted from the musical groups; and (4) the $25,115 bank loan. In so doing, he bears a heavy burden: he must "show that the court's loss calculations were not only inaccurate but outside the realm of permissible computations." *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013).

Bearing in mind that the court had to make the best estimate it could, and that Collins had no incentive to make his conduct transparent, we find that the court did not clearly err

---

[1] Collins actually refers to an eight-level increase in his brief, see Br. of Appellant at 31, 38. The government correctly points out, however, that the court applied a ten-level enhancement, based on a loss calculation of $190,540.30. Br. of Appellee at 30 & n.2; see also U.S.S.G. § 2B1.1(b)(1)(F). Our analysis is not affected by this discrepancy.

in its calculations. For example, he complains that the estimate of unreported credit-card charges failed to take into account the fact that the Park District did not have any policies, rules, or guidance regarding the use of the card. But the court was surely entitled to infer that the Park District wanted the card to be used for Park District purposes. And the government submitted evidence comparing the actual credit card statements with the falsified reports that Collins submitted to the board. This evidence revealed many discrepancies, including missing fuel, restaurant, bar, and hotel charges. It also showed that Collins frequently did not document his expenses with receipts and vouchers, while other employees with credit cards did so. The final amount disclosed by this evidence, $42,604.30, represented a reasonable estimate for this item.

Collins also disputes the district court's decision to peg the lost revenue from ticket sales at the 2015 Barbeque Fest at $54,899. As we noted earlier, the court decided to rely on Collins's own estimate of the number of attendees (9,900) rather than the "clicker" number (9,453), and thus came up with an estimated $54,899 as the loss figure. As Collins himself concedes, it is hard to come up with anything more than an estimate. Some of the "clicked" attendees might have been admitted for free; some might have been VIPs who paid $35 per ticket; and some undoubtedly paid the normal price. But Collins needed to refute the government's showing with something better than the argument that the bookkeeping for the Fest was sloppy. Indeed, the district court probably thought that Collins had decided to withdraw this part of his challenge to the loss amount. He objected to the inclusion of the $54,899 when the PSR was filed, but at sentencing, he did not raise that objection and affirmatively stated that he had no

objections beyond the ones he had mentioned. This was at least forfeiture, if not waiver, of the point.

Next, Collins argues that the district court erred by holding him responsible for $25,590 stolen from the account that was to be used for various bands that performed at the 2014 Fest. The Park District owed five bands a total of $104,000 for their performances. Each one was wired half of its fee before the Fest and was to be paid the balance at the event or afterwards. Four of those bands received cashiers' checks for the remaining amount during the Fest, while one received cash. The problem was this: Park District bank records showed that the five payments had been drawn from its account, but there was then an *additional* cash withdrawal for $52,500 around the time of the 2014 event. A Park District employee testified that Collins had given her $104,000 in cash (an amount that included the $52,500 withdrawal) and cashier's checks and told her to split it up and give him the envelopes with the cash. It was impossible to trace exactly what happened to the extra $52,500, but statements prepared by Collins showed that $26,910 was used for start-up cash in 2014. That left $25,590 unaccounted for. The government's theory, which the court accepted, was that it wound up in Collins's pocket; Collins offered nothing to indicate this was wrong.

The Municipal Bank loan for $25,115 is the last item on Collins's list. He argues that it should not have been included because it had nothing to do with the alleged fraud. A government witness, however, testified that because Collins had stolen money that should have been spent on Barbeque Fest expenses, some vendors still needed to be paid. Collins thus used the loan to cover up his earlier thefts. The district court

accepted the government's interpretation of the evidence, and we cannot say that it clearly erred in doing so.

Taking these items (even the low-end estimate for the ticket-sale thefts) along with the other, uncontested losses (approximately $42,447), the actual loss amount easily exceeds $150,000, which is the amount associated with a ten-level boost in the base guideline level for U.S.S.G. § 2B1.1. It is approximately $190,000 if the ticket losses are calculated using Collins's own figures; it is approximately $182,000 if they are calculated using the clicker amounts.

## B. Acceptance of Responsibility

The only other thing that could have made a difference for Collins's guidelines calculation was acceptance of responsibility. The Sentencing Guidelines call for the offense level to be reduced by two if "the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Whether a person has done so is a question of fact for the district court to resolve. *United States v. Robinson*, 942 F.3d 767, 770 (7th Cir. 2019); *United States v. Nichols*, 847 F.3d 851, 859 (7th Cir. 2017).

The district court here gave sound reasons for its finding that Collins was not entitled to this adjustment. It noted that Collins had attempted to dismiss the indictment or to withdraw his guilty plea. Moreover, Collins had objected to "about every single thing in the presentence report" and had denied "a lot of relevant conduct" despite his plea of guilty. At one point the judge, showing a bit of frustration, said that "it seems in some regard that we've almost been through a trial anyway." The judge also thought that Collins had

displayed arrogance and a lack of remorse throughout the proceedings and in his letter of allocution.

More than a guilty plea is necessary before a district court ought to award a discount for acceptance of responsibility. The court here fully supported its factual finding that Collins had not fully acknowledged his crimes. We will not second-guess that conclusion.

**IV**

Collins has argued that the amounts of restitution that the district court ordered for the Park District or the Foundation, on the one side, and for the bank, on the other, were not supported by the evidence. The government has responded that these issues are not properly before us, because Collins never took an appeal from the district court's order fixing his restitution obligations. We address that issue first, as it turns out to be dispositive.

In *Manrique v. United States*, 137 S. Ct. 1266 (2017), the Supreme Court addressed the question "whether a single notice of appeal, filed between the initial judgment [imposing certain aspects of a criminal sentence] and the amended judgment [fixing restitution], is sufficient to invoke appellate review of the later-determined restitution amount." *Id.* at 1270. It answered that question in the negative, "at least where, as here, the Government objects to the defendant's failure to file a notice of appeal following the amended judgment." *Id.*

The Court's reasoning was straightforward: an appeal ought to be filed only after the district court has decided the relevant issue. *Id.* at 1271. It indicated that this is "at least" a mandatory claims-processing rule, *id.*, that is "unalterable" if properly and timely raised. *Id.* at 1272. See also 18 U.S.C.

§ 3742(a); Fed. R. App. P. 4(b). Not only had Manrique filed his notice of appeal before the district court entered its restitution order; the district court's initial judgment had expressly deferred the determination of restitution and had indicated that an amended judgment would follow. 137 S. Ct. at 1270. This was enough, the Court said, to prevent the initial judgment and the amended judgment from merging to become one single judgment entered on the earlier date. Nothing in Appellate Rule 4(b)(2) is to the contrary: it permits a notice of appeal that is filed too early to be effective only if the issue sought to be appealed has already been resolved. *Id.* at 1273.

*Manrique* squarely controls here: the district court entered an initial judgment that resolved all sentencing issues except restitution; it indicated clearly on that judgment that the determination of restitution was "RESERVED," and it later issued an amended judgment. Collins urges that he can avoid *Manrique* because his is not a "deferred restitution" case, but we cannot imagine how one could reach that conclusion. The fact that the court did not fix a date for the amended judgment is of no importance. As the Supreme Court put it in *Manrique*, "deferred restitution cases involve two appealable judgments, not one." *Id.*

Because the government has invoked its rights under *Manrique*, the restitution portion of Collins's appeal must be dismissed. This is so whether we regard the need for a second notice of appeal as a claims-processing rule, as the Court strongly hinted, or if (as the government argues here) because it affects our appellate jurisdiction. We therefore have no comment on the details of the restitution orders.

**V**

Collins pleaded guilty to both mail and wire fraud. Although at one point he sought to withdraw that guilty plea, he abandoned that argument on appeal. He thus presented only challenges to his sentence. We conclude, however, that the district court did not err in calculating his sentencing range under the Sentencing Guidelines. Furthermore, we conclude that he has forfeited the right to complain about the restitution that the court ordered, because he failed to file a timely notice of appeal from the district court's amended judgment. In sum, we AFFIRM the judgment of the district court.