In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3161

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL SHENEMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:10-CR-126—**Jon E. DeGuilio**, *Judge.*

ARGUED APRIL 13, 2012—DECIDED JUNE 1, 2012

Before BAUER, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Michael Sheneman and his son
Jeremie engaged in an elaborate mortgage fraud scheme
that convinced unwitting buyers to purchase a large
number of properties they could neither afford nor rent
out after purchasing (as they had planned). As part of
the scheme, mortgage lenders were duped into financing
these ill-advised purchases through various misrepre-
sentations about the buyers and their financial stability.

All told, four buyers with few assets and no experience in the real estate market purchased sixty homes. Most of the homes were eventually foreclosed upon, and the buyers and lenders each suffered significant losses. Sheneman was subsequently convicted of four counts of wire fraud and sentenced to ninety-seven months' imprisonment. On appeal, he challenges the sufficiency of the evidence supporting his conviction, as well as the district court's application of two sentencing enhancements. We find none of these contentions meritorious, and accordingly affirm his conviction and sentence.

## I. BACKGROUND

From 2003 to 2005, Sheneman and Jeremie worked in tandem to defraud both real estate buyers and mortgage lenders through a series of calculated misrepresentations. Generally speaking, their plan involved acquiring control over a large number of rental properties, inducing buyers to purchase the properties through a host of false promises, and ensuring that lenders would finance the purchases by falsifying loan documents and misrepresenting the buyers' financial standing.

Sheneman and Jeremie began by acquiring control over a large number of rental properties being sold by landlords in the South Bend and Mishawaka areas of Indiana. Many of these sellers had difficulty renting out their properties—some were in very poor condition—and were, by and large, simply looking to cut their losses and walk away from the homes with their mortgages and taxes paid. They agreed to sell their properties to

either Sheneman or Jeremie, both of whom had a reputa-
tion for "flipping" homes and selling them at a profit.
Although most sellers believed they had sold their prop-
erties directly to either Sheneman or Jeremie, the sellers
had in fact merely granted one of the two power of attor-
ney over their properties.[1] By exercising powers of attor-
ney, Sheneman and Jeremie took control over the proper-
ties without ever appearing on any chain of title. The
sellers, for their part, did not notice much of a practical
difference. Each seller received the amount of money
agreed upon as the selling price—albeit not from a
title company, as would normally be the case, but
directly from either Sheneman or Jeremie. After they
"flipped" the houses and sold them to new buyers for
more than the seller's asking price, Sheneman and Jeremie
then endorsed and deposited the checks issued by the
title company directly into their own accounts, yielding
them hefty profits.

Once granted control, Sheneman and Jeremie then
set about searching for buyers to purchase the dilapidated
properties. Eventually, they found their marks, selling
sixty properties to four buyers with no relevant real estate
experience: Gladys Zoleko, a Cameroonian citizen in
the United States on a student visa, bought fifteen
homes; Paul Davies, a Liberian citizen also on a student
visa, bought fourteen homes; David Dootlittle, an electri-
cian, bought twenty-one homes; and Gary Denaway, a

---

[1] Of the sixty homes, Sheneman purchased or was granted
power of attorney over thirty-four homes.

maintenance worker, bought ten homes. For each buyer, a very similar pattern of conduct transpired.

Sheneman and Jeremie made a wide range of promises to the buyers—false promises, as it turns out—in order to induce the sales. The buyers were all looking for an additional source of income, and Sheneman promised them just that. Significant profits could be made by purchasing homes and then renting them out—the more homes purchased, the bigger the profit. The homes were all in excellent condition, buyers were assured, and either Sheneman or Jeremie would make any necessary repairs. There was also little risk because most of the homes already had paying tenants living in them, and Sheneman and Jeremie would help find new tenants for vacant homes. And if the buyers ever wanted to get out of the real estate business, Sheneman and Jeremie promised to buy back properties that they no longer wanted. Perhaps most enticing of all, Sheneman and Jeremie also promised to cover all down payments and closing costs. The buyers, despite their relatively modest incomes, could therefore purchase a large number of homes and begin earning an immediate profit—without having to spend a dime out-of-pocket. They jumped at the chance.

The buyers, for their part, ignored some clear red flags. Most obviously, they were only permitted to see one or two of the properties they were purchasing prior to closing. The other homes, buyers were told, had tenants already living in them and a visit to those homes might disturb the tenants. But the buyers were

assured that the other homes were all in similar condition and located in comparable neighborhoods.

Buyers filled out only minimal paperwork throughout the process. Sheneman brought each potential buyer to Superior Mortgage, a mortgage broker where Jeremie worked as a loan officer.[2] There, each buyer completed a few documents with some very basic information. Shortly thereafter, Jeremie informed the buyer that he or she was approved to buy a large number of properties. In order to ensure that mortgage lenders approved the loan applications, however, Jeremie falsified key parts of the documents. Among other misrepresentations, numerous loan applications falsely stated the buyers' citizenship, employment status, and finances, and the buyers' signature on many documents was often forged.

Beyond falsifying documents, Sheneman and Jeremie took other steps to secure financing from lenders and ensure the closings took place. First, they artificially inflated buyers' bank accounts, depositing tens of thousands of dollars in order to make it appear as though the buyers had sufficient assets to take on the loans. After the transactions were completed, the money was returned to Sheneman and Jeremie. Second, they masked

---

[2] Although only Jeremie was an employee of Superior Mortgage, Sheneman attended many of the buyers' meetings with Jeremie, and visited the offices often enough that some employees mistakenly believed Sheneman was a part owner of the business.

the buyers' financial infirmities from lenders by utilizing certified checks to cover down payments and closing costs. Lenders therefore had no way of knowing that the buyers were not the true source behind these payments, as the loan documents contemplated.

After closing, each of the buyers quickly discovered that the deals they were promised were too good to be true. A number of the newly purchased homes were hardly habitable. Some had faulty plumbing, others had significant mold and termite damage, and yet others had structural damage and leaky roofs. Moreover, paying tenants were difficult to come by. Many of the homes did not have tenants living in them—despite previous assurances to the contrary—while others had tenants who never paid rent. Often, the few homes that the buyers had actually viewed prior to closing were not even included among the properties they had purchased. Many of the properties were also located in worse neighborhoods than the ones they had visited.

When the buyers contacted Sheneman and Jeremie to repair the homes or assist them in finding tenants, as they had promised to do, they were suddenly difficult to reach. The buyers' calls would often be ignored, or Sheneman and Jeremie would hang up when the buyers began complaining. In the end, Sheneman and Jeremie made very few repairs to the properties and reneged on their promise to buy any of them back. Unsurprisingly, each of the buyers was soon unable to make timely mortgage payments. Of the sixty properties: thirty-six were foreclosed upon, eleven were deeded back to the lender

in lieu of foreclosure, six were demolished by the city, and four were sold in tax sales.[3]

Sheneman and Jeremie were indicted on October 13, 2010, and charged with four counts[4] of wire fraud in violation of 18 U.S.C. § 1343. After a four-day jury trial, they were convicted on all four counts. At sentencing, the district court calculated Sheneman's advisory sentencing guidelines range to be 87 to 108 months' imprisonment. In doing so, the court applied several sentencing enhancements, including enhancements for a loss amount of more than $1 million, using sophisticated means, having ten or more victims, and gaining more than $1 million in gross receipts from a financial institution. The district court then sentenced Sheneman to 97 months' imprisonment.

## II. ANALYSIS

On appeal, Sheneman challenges the sufficiency of the evidence underlying his conviction for wire fraud. He also challenges two of the district court's findings at

---

[3] A forensic auditor for the Department of Housing and Urban Development, Richard Urbanowski, was unable to determine the status of the final three properties.

[4] Each count charged in the indictment identified one property sold in connection with the wire fraud. Thus, a total of four properties were identified in the indictment. At trial, the government presented evidence that sixty properties were sold as part of the overall mortgage fraud scheme.

sentencing that resulted in sentencing enhancements, arguing: (1) that the loss amount was not in excess of $1 million, and (2) that the offense did not involve the use of sophisticated means. We take each of these arguments in turn.

*A. Sufficiency of the Evidence*

Sheneman first challenges his conviction, arguing there was insufficient evidence to establish wire fraud. Typically, we will reverse a conviction only where the evidence, viewed in the light most favorable to the government, is "devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011), *cert. denied*, 132 S.Ct. 1537 (2012). Although we have characterized this standard as "highly deferential" and "nearly insurmountable," the even more stringent plain error standard applies here because Sheneman did not move for a judgment of acquittal in the district court. *See United States v. Irby*, 558 F.3d 651, 653 (7th Cir. 2009). Under the plain error standard, Sheneman must show that "a manifest miscarriage of justice will occur if his conviction is not reversed." *United States v. Powell*, 576 F.3d 482, 491-92 (7th Cir. 2009) (internal quotation marks omitted).

To establish wire fraud under 18 U.S.C. § 1343, the government must prove (1) Sheneman's participation in a scheme to defraud, (2) his intent to defraud, and (3) his use of interstate wires in furtherance of the fraud. *United States v. Green*, 648 F.3d 569, 577-78 (7th Cir. 2011).

Sheneman challenges the sufficiency of the evidence with respect to all three of these elements.

Sheneman begins by contending that the evidence is insufficient to establish there was any scheme to defraud. "A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of [a] material fact.'" *Powell*, 576 F.3d at 490 (*quoting United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007)). Sheneman's argument is a non-starter; there was an abundance of evidence presented at trial detailing the numerous false statements and material misrepresentations made by both he and Jeremie throughout the course of their fraudulent enterprise. The jury heard evidence that Jeremie falsified key portions of loan documents, that Sheneman made a series of misrepresentations to buyers about the homes, and that both Jeremie and Sheneman concealed the true nature of the buyers' finances by inflating bank accounts and using certified checks at closings. Plainly, there was sufficient evidence of a scheme to defraud.

But even if there was a scheme to defraud, Sheneman maintains, he was an unwitting participant. "[I]ntent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) (*quoting United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)). Sheneman lacked the specific intent to deceive because he was a hapless pawn in his son's fraudulent scheme, or so the

argument goes. It was Jeremie, after all, who forged documents and completed loan applications riddled with material misstatements. Sheneman was merely selling homes to interested buyers; how was he to know the extent of Jeremie's wrongdoing?

We are not convinced; there was ample circumstantial evidence of Sheneman's intent to defraud. A specific intent to defraud may be established both from circumstantial evidence and inferences drawn by examining the scheme itself. *Id*. As we have already stated, Sheneman took an active part in misleading the banks and causing them to believe that the buyers were financially capable of taking on the loans. More fundamentally, Sheneman played a crucial role in nearly every aspect of the fraudulent scheme from beginning to end. He induced buyers to purchase the homes through various misrepresentations, then immediately referred them to Jeremie so that loan documents could be falsified. He also attended closings and was present at many of Jeremie's meetings with buyers, and therefore was involved in every step of the process. This is all to say that the evidence is more than adequate to support the jury's determination that Sheneman was no unwitting pawn in Jeremie's fraudulent scheme, but rather an active participant with the requisite level of intent.

The last element of wire fraud requires that interstate wire communications were used in furtherance of the fraud. Wire fraud statutes, like mail fraud statutes, are not intended to reach all frauds but only those "limited instances in which the use of the [wires] is a part of the

execution of the fraud." *Schmuck v. United States*, 489 U.S. 705, 710 (1989); *see also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (same analysis applies to both mail and wire fraud statutes). The use of the wires need not be an essential element of the scheme; it is enough if the use is "incident to an essential part of the scheme" or "a step in the plot." *Schmuck*, 489 U.S. at 710-11 (brackets omitted) (*quoting Badders v. United States*, 240 U.S. 391, 394 (1916)). Moreover, it is not necessary for the use of the wires to contain any false or fraudulent material, and even a routine or innocent use of the wires may satisfy this element so long as that use is part of the execution of the scheme. *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008*)*.

The wire uses at issue are four bank-to-bank wire transfers, one for each count charged in the indictment. In each case, the lending bank wired funds interstate to the title company on or about the closing date. Sheneman primarily advances two arguments as to why evidence of these wire transfers is insufficient to sustain his conviction. First, he contends that he did not "cause" the transfers, and was unaware that they occurred. Second, Sheneman argues that the wire transfers did not play any role in the execution of the scheme. Instead, Sheneman posits, he would have received the sales proceeds from the title company regardless of whether or not the lending bank ever wired funds to the title company, and thus the scheme's success in no way depended on the wire transfers taking place. We disagree.

Although Sheneman did not "cause" the transfers to occur, there is no requirement that a defendant personally cause the use of the wire. Rather, it will suffice if the use of the wire "will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended." *Turner*, 551 F.3d at 666 (*quoting Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). Here, it was well within reason for the jury to conclude that Sheneman, given his involvement in the real estate market, could reasonably foresee that lending banks would use wire transfers to transmit loan proceeds in the course of real estate transactions. *See United States v. Mullins*, 613 F.3d 1273, 1281 (10th Cir.), *cert. denied*, 131 S.Ct. 582 (2010) ("[W]ire transmissions are integral to other parts of real estate transactions, such as transferring funds, with which real estate agents are profoundly familiar."). Sheneman's second argument, that the wire transfers played no role in the scheme, fares no better. In each case, Sheneman received disbursements from the title company only *after* the mortgage lender approved the loan and wire transferred the funds interstate to the title company. As such, there was evidence that Sheneman would not have received any disbursements from the title company absent the wire transfers, and the fraudulent scheme thus would have been foiled. There was simply no manifest miscarriage of justice in the jury's verdict.

*B. Sentencing*

Next, Sheneman challenges two of the district court's determinations at sentencing. First, he argues that the

district court erred in finding that the loss amount was in excess of $1 million, which resulted in a sixteen-level enhancement to Sheneman's offense level. *See* U.S.S.G. § 2B1.1(b)(1)(I) (2010). Second, Sheneman contends that the district court erred in finding that sophisticated means were used in the mortgage fraud scheme, which resulted in a two-level enhancement. *See id.* § 2B1.1(b)(9)(C).

We review the district court's application of the sentencing guidelines *de novo* and its findings of fact for clear error. *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008). Under the clear error standard, we will affirm a district court unless "we are left with the definite and firm conviction that a mistake has been committed." *United States v. Reese*, 666 F.3d 1007, 1021 (7th Cir. 2012).

*1. Loss Amount*

The district court found that mortgage lenders suffered losses totaling $1,084,671.54 for the sixty properties sold as part of the mortgage fraud scheme.[5] Sheneman does not challenge the district court's method of calculating these losses. Instead, he argues that the court erred in considering the lenders' losses at all. Echoing his earlier argument, Sheneman points out that he did not falsify loan documents—again, that was Jeremie. Because

---

[5] The district court found that the four buyers also suffered monetary losses, but noted that these losses could not be quantified.

Jeremie was responsible, Sheneman contends that the scope of the fraud he agreed to did not extend to the loan application process, and that Jeremie's acts were not reasonably foreseeable. Thus, Sheneman maintains that Jeremie's misconduct alone caused the lenders' losses, and should not have been considered. But, for similar reasons that we have already discussed in addressing Sheneman's earlier challenges, we disagree.

Section 1B1.3(a)(1)(B) of the sentencing guidelines allows a defendant to be held accountable for the conduct of others, but only if that conduct was "in furtherance of a jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity." *United States v. Salem*, 657 F.3d 560, 564 (7th Cir. 2011) (citation omitted). The scope of jointly undertaken criminal activity, however, is not necessarily the same as the scope of the entire scheme. U.S.S.G. § 1B1.3 cmt. n.2. In determining the scope of the criminal activity that a particular defendant agreed to jointly undertake, "the district court 'may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.'" *Salem*, 657 F.3d at 564 (*quoting* § 1B1.3 cmt. n.2). Several factors are relevant in this determination, including: (1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation of the scheme. *Id.*

The district court properly found the scope of the criminal activity that Sheneman and Jeremie agreed to

jointly undertake involved the fraudulent sale of real estate, and this included fraudulently securing the buyers' financing. The scheme as a whole hinged on unqualified buyers securing financing, and necessitated a high level of coordination between Sheneman and his son. In each case, Sheneman quickly referred potential buyers to Jeremie for financing, and profits were pooled throughout the duration of the scheme, which lasted over two years. Moreover, Sheneman could have reasonably foreseen that fraudulent funding was being secured for the unqualified buyers. Not only was he aware that the buyers were on shaky financial grounds, he helped conceal this fact from lenders. And yet, each time he brought a buyer to Jeremie, the buyer was able to secure enough financing to buy as many as twenty-one homes. The district court did not err in considering the lenders' losses at sentencing.

## 2. Sophisticated Means

Finally, Sheneman argues that the district court erred in applying a two-level enhancement because the mortgage fraud scheme did not involve the use of sophisticated means. Sophisticated means are defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.8(B). The sophisticated means enhancement is proper when "the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *Green*, 648 F.3d at 576 (citation omitted). In other words, "the offense conduct, viewed as

a whole, was notably more intricate than that of the garden-variety offense." *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (brackets omitted) (*quoting United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009)).

Sheneman primarily argues that the scheme at issue was nothing more than a "garden variety home 'flipping' scam" (Appellant's Br. at 25), and therefore was no more complex than a typical fraud of its kind. But we think it clear that the district court's application of the sophisticated means enhancement was proper. Sheneman and Jeremie carefully orchestrated an intricate scheme that fooled buyers, sellers, and mortgage lenders, resulting in four unsophisticated buyers of limited means purchasing sixty properties. In doing so, they relied on their extensive knowledge of the real estate market and lending industry to perpetrate the scheme and avoid detection for several years. This was no simple scam: Sheneman and Jeremie utilized powers of attorney to conceal their activity; convinced buyers that the run-down properties would make sound investments; and fooled mortgage lenders into financing the purchases by falsifying loan documents, misrepresenting the source of down payments and closing costs, and artificially inflating buyers' bank accounts.

Moreover, we have previously upheld the application of a sophisticated means enhancement in cases involving similar mortgage fraud schemes. *E.g.*, *Knox*, 624 F.3d at 871-72 (defendant used fraudulent appraisals and false promises over seven-year period to convince buyers into purchasing 150 overpriced properties, and

falsified loan applications to fool mortgage lenders into financing); *Green*, 648 F.3d at 572, 576-77 (defendants acquired seventy properties over three-year period using fraudulent loan applications and fake documents to obtain mortgages); *see also United States v. Snow*, 663 F.3d 1156, 1163-64 (10th Cir. 2011), *cert. denied*, 132 S.Ct. 1615 (2012) (defendant procured forty-four overpriced properties for unqualified buyers over four-year period using fraudulent documentation and disguising buyers' financial standing). We find no error in the district court's sentencing.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Sheneman's conviction and sentence.