In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-1004 & 13-1005

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VIKTOR and LILYA DOMNENKO,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 08-CR-00179-5 & 08-CR-00179-6 — **Charles R. Norgle**, *Judge.*

ARGUED MARCH 31, 2014 — DECIDED AUGUST 18, 2014

Before WOOD, *Chief Judge*, and WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Viktor and Lilya Domnenko committed fraud twice in relation to the same house, once while buying it and once while selling. When purchasing the house, they submitted loan documents containing false incomes, doctored bank statements, and failed to disclose that the transaction was far from arm's length since Viktor's company was selling and his wife was buying. And, the

Domnenkos had a deal with Viktor's company that they would purchase the house for $750,000 and any money paid to the company above that amount would go directly to Viktor. So, the approximate $1 million in loans the Domnenkos received resulted in roughly $250,000 extra that was not disclosed on the settlement papers as going to the Domnenkos, even though it actually did. As a result of that $1 million loan, the Domnenkos were able to sell the house four months later for close to the same inflated amount, rather than the actual $750,000 that they paid for it, without raising any eyebrows. They also failed to disclose on the HUD-1 forms in the second transaction that they would be giving kickbacks from the sale to the buyer's side. Based on those facts, we reject their argument that the evidence failed to support their convictions for wire fraud. However, just because they were involved in a fraudulent scheme does not necessarily mean it was reasonably foreseeable that all the subsequent economic damages would occur, especially when there was no evidence that they knew they were selling the house to what turned out to be a fictional buyer. For that reason, we remand for further explanation by the district court as to why the loss of roughly $600,000 was "reasonably foreseeable" and why the 14-point sentencing enhancement was proper.

## I. BACKGROUND

Because the Domnenkos challenge their convictions based on the sufficiency of the evidence, we draw all reasonable inferences from the facts in the light most favorable to the government. *See United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014).

This case stems from two separate sales of the same house located in Wheaton, Illinois. Viktor Domnenko was a partner in JVS, a real estate investment group that originally owned the property. JVS sold the house on February 21, 2007 to Viktor's wife, Lilya Domnenko. Although Lilya's name was going to be on all the paperwork, Viktor told his partners that he would be the actual purchaser, agreed to a purchase price of $750,000, and testimony at trial showed that he pulled the strings behind the purchase. Lilya obtained two loans from Washington Mutual Bank ("WAMU") to buy the house, but those loans were secured based on documents that included the following misrepresentations: (1) Lilya's monthly income from Viktor's construction company was $37,500 (but she actually earned only $1,000 per month according to Viktor and Lilya's jointly filed and signed tax returns); (2) Lilya owned a First Eagle National bank account with a listed balance of $175,000 (but the balance was actually $109); and (3) Lilya individually owned another bank account at Fifth Third Bank (but it was actually jointly owned with Viktor). In addition, none of the settlement papers included the fact that Viktor was a partner at JVS and therefore was essentially on both sides of the transaction.

Based on the fraudulent loan documents, WAMU gave Lilya two loans in the amounts of $749,000 and $240,000 and she purchased the property. That is obviously above the $750,000 amount Viktor agreed to pay JVS. Pursuant to Viktor and JVS's agreement, any amount above their agreed upon $750,000 sales price was to be considered "upgrade fees" and was to revert back to Viktor and another one of his companies. The JVS minutes disclosed the terms of this "upgrade fees" deal and the HUD-1 reflected that JVS, as the seller, was to receive money back from the deal. But, the

HUD-1 did not explicitly say Viktor would be receiving roughly $250,000 back and the bank did not know since Viktor was not disclosed as a member of JVS. So, the disclosed transaction on the settlement forms was that JVS was going to receive an extra quarter million dollars; the undisclosed transaction is that every cent of that was going back to the buyer. In all, including the profits he made on the sale as a partner of JVS and the "upgrade fees", Viktor and his company ended up receiving about $260,000 from the deal.

The Domnenkos lived at the property for about four months and made all the mortgage payments, but then decided to sell. Viktor told a friend, Olanrewaju Okulaja, that Viktor would be willing to give cash back to anyone who was willing to buy the house. Okulaja enlisted the help of some friends who hatched a plan, having Scott Priest pose as "Robert Valle" and buy the house. Robert Valle is a real individual who was not involved in the transaction, but the friends stole his driver's license and social security card and replaced Valle's pictures with Priest's, thereby creating a fake or fictional individual whom we will call "Robert Valle" or "Priest/Valle." The Domnenkos and "Robert Valle" reached a deal and, in June 2007, Viktor, Lilya, Okulaja, and Priest (posing as Valle), among others, attended the closing. The closing documents did not disclose that the buyer or anyone on the buyer's side of the transaction would receive cash back or a finder's fee, even though such information is required on HUD-1 settlement documents and there was testimony from an employee at the lending institution that such information would have been material. "Robert Valle" received $1,090,573.06 in loans from Countrywide Insurance to complete the sale. After the closing, Viktor told Lilya to sign over her $129,490 proceeds check to Okulaja, which she did.

Not surprisingly, "Robert Valle" defaulted on the loan without making a single payment and Countrywide was eventually forced to sell the house for $487,500.

Viktor and Lilya were each charged with three counts of wire fraud pursuant to 18 U.S.C. § 1343 and aiding and abetting wire fraud under 18 U.S.C. § 2. After a bench trial, the trial judge found Viktor and Lilya guilty on all three counts. The Presentence Investigation Report ("PSR") determined that the loss to Countrywide was $603,073.06 (the difference between the value of "Priest/Valle's" loan and what the house eventually sold for) and recommended a 14-point enhancement pursuant to United States Sentencing Guidelines § 2B1.1(b)(1)(H) since the loss was over $400,000. Defense counsel for both Viktor and Lilya filed written objections to the enhancement, but the court never explicitly ruled on those objections. Defense counsel for each of the Domnenkos argued during the sentencing hearing that they should not be liable for the $600,000 loss because it was not "reasonably foreseeable" that damage would result from their actions, as is required for § 2B1.1(b)(1)(H) to apply. The district court did not explicitly reject or accept those arguments, but when the government asked to "confirm with your Honor that the Court has found the 14-point enhancement for the amount of loss," the court responded "Yes" without more. The district court applied the 14-point enhancement and sentenced Viktor to 46 months imprisonment on each count to run concurrently, and Lilya to one year and one day's imprisonment on each count to run concurrently. This timely appeal followed.

## II. ANALYSIS

The Domnenkos appeal their convictions, arguing the evidence was insufficient to support the conviction. They also appeal the 14-point enhancement, arguing that the $600,000 loss was not a "reasonably foreseeable" result of their fraud. As discussed below, we reject their first argument relating to the convictions but remand for further explanation as to why the loss amount was reasonably foreseeable, and therefore attributable, to the Domnenkos.

### A.  Evidence Sufficient to Support the Convictions

The Domnenkos first argue the evidence does not support the trial judge's verdict because they did not plan or plot together in relation to the first sale and therefore did not "scheme" to defraud. They also claim there was no fraud during the second sale because the purported kickback was actually repayment of a previous loan that was not tied to the sale and therefore did not need to be disclosed on the closing documents. Finally, they assert that when the two transactions are viewed together, even if the first sale was fraudulent, there was no "scheme" to defraud since a single fraudulent transaction does not constitute a "scheme."

When faced with a challenge to the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Torres-Chavez*, 744 F.3d at 993 (emphasis in original, quotations omitted). The Domnenkos face "a nearly insurmountable hurdle." *Id.* We will only reverse when the "record contains no evidence, regardless of

how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt." *Id.* (quotation omitted).

To establish wire fraud under 18 U.S.C. § 1343, the government must prove: (1) the Domnenkos' participation in a scheme to defraud; (2) their intent to defraud; and (3) the use of interstate wires in furtherance of the fraud. *See United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012). "'Intent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.'" *Id.* at 629 (quoting *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010)). The intent to defraud may be established both from circumstantial evidence and inferences drawn by examining the scheme itself. *Sheneman*, 682 F.3d at 629. Because the Domnenkos do not challenge the third prong, we do not address that issue.

First, the Domnenkos argue that there was no scheming involved in the first sale since there was no evidence presented to support the government's theory that they "planned and plotted all along." However, there is strong circumstantial evidence that the Domnenkos planned and plotted together from the very beginning. Viktor told JVS he was going to buy the house and that he controlled the entire transaction. His wife eventually used fraudulent means to follow through on Viktor's promises to JVS. This shows that both the Domnenkos were actively involved in the sale, even though Lilya was the only one who affirmed the truthfulness of what turned out to be fraudulent documents. Moreover, the numerous doctored documents that were submitted to support the loan directly implicated both Domnenkos on their face—*e.g.,* the removal of Viktor's name from a joint

checking account, and the inconsistency in the income amount Lilya received from Viktor's construction company as reflected on the loan documents versus their jointly signed tax forms. Finally, there is the fact that both Lilya and Viktor sat in on the closing without saying a word while those doctored documents were used to consummate a sale from Viktor's company to Viktor's wife, which was not a traditional arm's length transaction. A WAMU employee testified that the conflicted nature of the transaction would have been material information in the bank's decision to issue the loan. All of this circumstantial evidence together provides strong proof of a joint intentional plot to defraud the lender. *See United States v. White*, 737 F.3d 1121, 1130 (7th Cir. 2013) (quoting *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002) for the proposition that "'circumstantial evidence and … inferences drawn from examining the scheme itself … demonstrate that the scheme was reasonably calculated to deceive'").

Additional evidence individually implicates each of the Domnenkos as well. The case against Lilya in relation to the first sale is straight forward, as the material misrepresentations she made when she signed the HUD-1 form declaring the fraudulent documents to be truthful evidenced an intent to defraud the lender. *See, e.g., White*, 737 F.3d at 1130 (finding preparation of false HUD-1 statements and falsified documents was fraudulent); *United States v. Jaffe*, 387 F.3d 677, 681 (7th Cir. 2004) (signing knowingly untruthful and doctored settlement papers constituted fraud).

As to Viktor, the most telling evidence is that he sat in the room during the closing as the fraudulent papers that directly implicated him were used to close on a sale in which he

was on both sides of the table. He eventually signed onto the transaction as a joint mortgage holder without ever disclosing his personal involvement, which is an omission combined with an affirmative act of concealment sufficient to support his conviction. *See United States v. Powell*, 576 F.3d 482, 491 (7th Cir. 2009) (holding that failure of parties at closing to reveal their personal gain from the transaction constituted fraud). The conflicted nature of the transaction is especially important because Viktor stood to gain quite a bit from the sale. JVS and Viktor reached a deal that the house would be sold for $750,000 and any money above that would go to Viktor as "upgrade fees." So, Lilya secured a nearly $1 million loan for the transaction, with the full expectation that one quarter of that would be paid right back to Viktor. Since the bank knew that the extra money was going to JVS but did not know that Viktor was part of JVS and would personally receive the extra quarter million dollars, there was over $250,000 that went back to the buyer that was not disclosed to the lender or disclosed on the HUD-1. This failure to disclose the extra amounts on the HUD-1 forms constituted fraud. *See, e.g., White*, 737 F.3d at 1130; *Jaffe*, 387 F.3d at 681. Moreover, a reasonable trier of fact viewing the evidence in the light most favorable to the government could conclude that Viktor intended to defraud the banking institution by his involvement in the fraudulent documentation. First, he represented to his JVS partners that he was actually pulling the strings behind the sale, which showed that he was more than a passive participant. Second, as discussed above, the sale itself contained numerous doctored documents that directly implicated him on their face.

As to the second sale, the Domnenkos argue that the proceeds check Lilya signed and Viktor gave to Okulaja repre-

sented a repayment from a previous loan and therefore was
not a kickback that needed to be disclosed on the HUD-1.
While there is testimony to support that position, there is al-
so evidence that supports the conviction, which is enough
when we are reviewing for sufficiency of the evidence.
*Torres-Chavez*, 744 F.3d at 993 (stating we will "'overturn a
verdict only when the record contains *no evidence*, regardless
of how it is weighed, from which the jury could find guilt
beyond a reasonable doubt'" (emphasis added and internal
quotation omitted)). Okulaja testified that Viktor told him
"some of the proceeds would be given to … [the] buyer."
Okulaja then sent a message to a third party saying that
Viktor would "give money back on the property," thereby
memorializing the deal. The third party who received the
message confirmed its content at trial, and, as a result of the
text, helped recruit "Priest/Valle." The third party also testi-
fied that before the closing, the expectation was that the sell-
er would give the buyer a kickback from the sale. Ultimately,
when Lilya signed over her proceeds check, the closing pro-
ceeds went to individuals who were not disclosed on any of
the settlement statements, which is consistent with what
Viktor said would happen. That omission from the closing
documents was fraudulent and a reasonable juror could find
that Viktor knowingly and intentionally caused the kick-
backs not to be disclosed. *See, e.g., White*, 737 F.3d at 1130;
*United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002) (hold-
ing evidence of undocumented kickbacks at real estate clos-
ing was sufficient to support wire fraud conviction). Wheth-
er or not Viktor knew "Robert Valle" was a fake buyer is ir-
relevant to this issue; all that matters is that he knew and in-
tended that there would be undisclosed kickbacks to

"Priest/Valle" and others on the buyer's side, and that those kickbacks were eventually given.

And, it is also relevant that Viktor received roughly $260,000 in unreported funds back from the first sale, which turned what was really a $750,000 transaction into a $1 million transaction. As a result of that inflation, the sale from the Domnenkos to "Robert Valle" for roughly $1 million did not raise any red flags. Had the original sale been accurately disclosed as for $750,000, then the $250,000 increase in the sales price just four months later would have represented a big warning sign to any objective person viewing the transaction and would likely have prevented a lending institution from giving "Priest/Valle" a roughly $1 million loan to consummate the deal.

The evidence is less strong, though sufficient, with regards to Lilya. But we take this opportunity to note that the government must present sufficient evidence as to each of the Domnenkos individually, and cannot meet its burden simply by presenting evidence as to the Domnenkos jointly. As with Viktor, there is evidence that Lilya knew that the Domnenkos were receiving $260,000 from the first sale, which caused the second sale price to be inflated. Lilya was present when the handwritten minutes were prepared to reflect the deal between Viktor and JVS that anything above the $750,000 would go back to Viktor and his company. A reasonable juror could draw the inference that Lilya knew of this deal, was aware that it inflated the second sale price, and affirmatively took part in that inflated sale. Lilya knew that the original purchase was actually only for $750,000—that is what she told law enforcement agents when she was first approached—but still sold the property for roughly $1

million just four months later. A reasonable juror could infer she knew she was taking part in a fraudulent transaction when she stood to make a 33 percent profit in just four months.

In addition to the inflation, there is also circumstantial evidence that Lilya knew there would be an unreported kickback in the second sale. Okulaja testified that he and Viktor discussed the kickback at that closing, which Lilya attended, before the closing papers were signed. Okulaja also commented at the closing on how neither Okulaja nor his company was on the HUD-1 forms even though, he testified later, it was his understanding that he should have been listed. Lilya knew that neither Okulaja nor anyone else was included as a recipient of the proceeds from the sale when she signed the HUD-1 forms, but signed them nonetheless. In the light most favorable to the government and with all reasonable inferences drawn in its favor, a rational juror could find that Lilya knew before the closing was consummated, based on the conversation between Okulaja and Viktor, that a party not included on the HUD-1 forms would be receiving a kickback. A juror could therefore conclude Lilya intended to defraud the lender when she signed those incomplete HUD-1 forms with that knowledge.

Our conclusion that there were two fraudulent transactions forecloses the Domnenkos' argument that, at most, there was only one fraudulent sale and they could not have therefore been involved in a "scheme." We therefore affirm the convictions.

### B. District Court Erred By Not Explaining Reasoning in Adopting 14-Point Enhancement

The Domnenkos next challenge the district court's application of the 14-point enhancement for a "reasonably foreseeable" loss of over $400,000. *See* U.S.S.G. § 2B1.1(b)(1)(H). The Domnenkos argue the district court made no finding as to why the loss Countrywide suffered from the sale to "Priest/Valle" was reasonably foreseeable to the Domnenkos, especially given the government concession that it is unlikely either Viktor or Lilya knew they were selling to a fictional buyer. The definition of loss and whether the district court followed proper procedures at sentencing are questions that we review de novo, but we review the district court's loss calculation for clear error. *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011).

The PSR included a 14-point enhancement for both Lilya and Viktor relating to Countrywide's eventual sale of the home since the amount of loss was $603,073.06, or the difference between Countrywide's loan to "Robert Valle" and the amount Countrywide eventually received in the sale of the home. Since the loss was over $400,000, the PSR found it triggered the 14-point enhancement under U.S.S.G. § 2B1.1(b)(1)(H). The PSR, however, did not explain how the loss was a "reasonably foreseeable" result of the Domnenkos' fraud, as it must be for the enhancement to apply. *See* U.S.S.G. § 2B1.1 Application Note 3(A)(i) (defining actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense"). A "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known,

was a potential result of the offense." *Id.* at Application Note 3(A)(iv).

The Domnenkos filed a joint objection to the PSR and argued during the sentencing hearing that the 14-point enhancement should not apply because the loss should not have been attributed to them. The court adopted the PSR, but did not explicitly address these points in determining either of the Domnenkos' sentences. The only discussion of the enhancement occurred when the government properly raised the issue and asked to "confirm with your Honor that the Court has found the 14-level enhancement for the amount of loss." The trial judge responded "Yes" without more. The court did not further explain its reasoning and neither Domnenko pressed the issue. The only other reference made by the court was that the loss was "by no means a small amount of money." The Domnenkos correctly argue this statement by the court was not enough alone to support the enhancement.

The district court erred by not explaining why the enhancement was proper, specifically why the $600,000 was "reasonably foreseeable" to either Domnenko. This case is virtually on all fours with *Leiskunas*, in which we considered a sentencing court's failure to explain why a loss amount was "reasonably foreseeable." We stated:

> A sentencing court commits procedural error by not adequately explaining its choice of sentence. … And some statement of the district court's reasoning is necessary for this court to be able to meaningfully review its decision. Here, the lack of explanation by the district court in attributing the [loss] to Leiskunas [as

> a] reasonably foreseeable loss means we cannot meaningfully review the court's decision. And, because of the court's silence, we cannot be sure of the effect that Leiskunas's argument had, or could have had, on the court's sentencing decision. These procedural standards operate as safeguards against unintentional infringements on defendants' rights.

*Leiskunas*, 656 F.3d at 738 (internal quotations omitted). The sentencing here suffers from the same deficiencies and requires the same outcome, namely a remand for further explanation. There is no evidence that the Domnenkos knew that "Priest/Valle" was a fictitious buyer, as the government conceded during the trial by stating "we believe now that there is no evidence that the Domnenkos knew about the stolen identity of Robert Valle." We are unable to discern why the district court found the loss Countrywide suffered after "Robert Valle" failed to make a single payment on the house should be attributed to the Domnenkos.

The government argues we can infer the district court's reasoning based on the fact that the court found the Domnenkos knowingly and intentionally defrauded Countrywide, the loss of $600,000 was by no means a small amount, and that the Domnenkos acted sophisticatedly and with premeditation. We reject this argument because it reads any reasonable foreseeability analysis out of the Sentencing Guidelines. If the government was correct, practically every defendant convicted in every fraud case could be held responsible for every resulting loss, foreseeable or not, since everyone convicted under 18 U.S.C. § 1343 must have had an intent to defraud. *See Sheneman*, 682 F.3d at 628. But that is

not what the Guidelines say. The loss must be "reasonably foreseeable," which requires some causation analysis, and that was not done here. *See United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (noting there must be both "but for" and "legal" causation for the enhancement to apply). We express no opinion on whether or not the loss is reasonably foreseeable to the Domnenkos, but such a determination should be made and explained by the district court. We therefore remand to give the court an opportunity to explain its rationale in attributing that loss amount to the Domnenkos.

## III. CONCLUSION

The decisions of the district court are AFFIRMED in part and REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.