In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1115

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH D. COURTRIGHT,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20-cr-00077-1 — **Matthew F. Kennelly**, *Judge.*

ARGUED APRIL 9, 2025 — DECIDED OCTOBER 17, 2025

Before EASTERBROOK, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Kenneth Courtright promised investors a guaranteed, perpetual minimum monthly payment from his company's revenue. Yet the company never generated sufficient revenue to cover the required payments. A jury found that, faced with a shortfall, Courtright operated a scheme in which he used upfront fees from later-arriving investors to make up the difference. The jury

convicted Courtright of seven counts of wire fraud and the district court sentenced him to 90 months in prison. On appeal, Courtright challenges the sufficiency of the evidence presented at trial and the district court's manner of calculating the loss caused by his conduct. We affirm.

## I.

### A. Facts Developed at Trial

Courtright owned and operated Today's Growth Consultant ("TGC"), which did business as The Income Store. TGC made money by creating, purchasing, and promoting websites that generated advertising proceeds. TGC signed up investors, also referred to as "site partners," who paid in to receive a monthly share of TGC's revenue. Site partners' relationships with TGC were governed by Consulting Performance Agreements ("CPAs"). Under the CPAs, site partners paid an "upfront fee" to be used "exclusively [for] the purchase, hosting, maintenance, and marketing" of certain identified websites. In exchange, the website would become the "sole property" of the signatory site partner, and the site partner would be entitled to a monthly payment "into perpetuity equal to the greater of 50% of the advertising revenues generated by websites assigned to the site partner or the monthly equivalent of at least 15% of the site partner's upfront fee." The CPAs also guaranteed that TGC was "in satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties." In actuality, TGC never generated sufficient advertising revenue to cover its guaranteed monthly payment obligations to site partners. During the charged scheme (from January 2015 to December 2019), TGC posted approximately $27.8 million from website revenue and business loans, far less than its $49.3 million

mandatory payment obligation. It was only due to the $132.6 million in revenue generated from upfront fees (that is, signing on new site partners) that TGC was able to make the guaranteed monthly payments. At trial, the government presented ledgers and elicited testimony from several witnesses who confirmed the improper use of upfront fees. Three witnesses—TGC's controller, TGC's accountant, and an FBI forensic accountant—discussed the company's financial condition. They all testified that the company would have been unable to meet its financial obligations if it failed to sign on new site partners. A loan officer from a bank that issued TGC lines of credit also testified that Courtright told him he used incoming money from new site partners to cover costs when there was insufficient advertising revenue.

Apart from presenting evidence at trial that TGC was unable to make mandatory payments without misappropriating upfront fees, the government also presented evidence that TGC was not in satisfactory financial condition. TGC initially expanded quickly to hire over one hundred employees in a few years' time. But Courtright testified that revenue decreased substantially between 2017 and 2019. By 2019, Courtright testified that, to keep TGC afloat, he personally obtained a $2.5 million loan for the company from a private individual and millions of dollars in business loans with interest rates as high as 200%.[1]

But by this point, it was too late, and investors had had enough. The Securities and Exchange Commission brought a

---

[1] Courtright also transferred $2.9 million from TGC's accounts to his personal bank accounts and used $975,000 of TGC's money to pay his own mortgage and tuition fees for loved ones.

civil enforcement action against TGC in 2019. *See SEC v. Courtright*, 19-CV-8454 (N.D. Ill.). The district judge in the SEC action ultimately appointed a receiver tasked with ensuring investors recouped as much of their losses as possible. Separately, Courtright faced criminal charges: seven counts of wire fraud. *See* 18 U.S.C. § 1343. Prosecutors alleged that he operated a Ponzi scheme in which he misrepresented the financial health of TGC and solicited funds from new investors to pay monthly payments to other investors in violation of the CPAs. A jury convicted Courtright on all counts.

### B.  Sentencing

At sentencing, the parties debated the proper way to calculate the loss amount attributable to Courtright's conduct. The answer would affect how much Courtright's offense level under the Sentencing Guidelines increased. U.S.S.G. § 2B1.1(b)(1) (setting out threshold loss amounts and their corresponding offense level increases).

The government presented several methods of calculating the loss amount. The first was a simple equation based on the difference between site partners' initial investments and the final amounts they recouped as reflected in the prosecutors' records. This loss amount came out to $91.3 million. The second formula simply adopted the total amount of claims the receiver in the SEC action had approved. This loss amount was much lower, at $70 million. The third and fourth formulas hybridized the receiver's and the prosecutors' loss tallies. The third formula replaced individual investors' loss amounts as identified by the prosecutors' records with the amounts site partners recovered from the receiver where applicable. This resulted in a total loss amount of $86.3 million. The fourth proposed approach removed any investors from

the loss amount calculation entirely who failed to submit a claim to the receiver. This loss totaled $69.3 million. Because each of the four formulas yielded a loss amount exceeding $65 million but not $150 million, the corresponding increase to Courtright's base offense level was the same for each, meaning Courtright's sentencing exposure remained the same as well. U.S.S.G. § 2B1.1(b)(1). The government was therefore indifferent as to which formula the district court ultimately used.

The defense asked the court to apply the fourth formula, which calculated the loss at $69.3 million, and then to make certain deductions to that loss amount. These included deductions for: (1) money that TGC would return to investors in the SEC case ($6.995 million); (2) a website buy-back offer TGC previously made to investors ($22 million); (3) the amount in claims extinguished by those investors who took ownership of their websites instead of receiving a cash judgment from the receiver ($7.873 million); and (4) TGC's operating expenses (workforce and infrastructure costs) ($34.73 million).

The district court ultimately adopted the fourth formula and its associated $69.3 million figure. The court also granted Courtright's first and third requested deductions—for the $6.9 million returned to investors in the SEC case and the $7.8 million extinguished when investors claimed their websites. The court denied a deduction for the $22 million buy-back offer because the offer was conditioned on Courtright's continued employment at TGC as its Chief Security Officer. The court also denied the $34 million infrastructure deduction because, the court said, that would be tantamount to permitting an armed bank robber to be credited for expenses like the robber's gun, bullets, mask, and getaway car. The court

calculated the final loss amount to be $52.5 million, which corresponded to a 22-level increase to Courtright's base offense level of 7. Courtright's ultimate offense level (inclusive of enhancements not relevant to this appeal) was 37, which correlated to a sentencing guideline range of 210 to 262 months' imprisonment. The court sentenced Courtright to 90 months in prison on all seven counts, to run concurrently, and two years of supervised release. We turn now to the merits of Courtright's appeal. In Part II, we consider the district court's denial of Courtright's motion for a judgment of acquittal. In Part III, we address the sentencing challenge.

## II.

Courtright moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal both during and after trial. He made the first motion orally at the close of the government's case in chief. As grounds for acquittal, Courtright argued that he could not have violated the CPAs' terms restricting the use of upfront fees because another CPA provision, referred to as the "draw provision," permitted TGC to pay site partners from their own collected upfront fees when their websites generated insufficient revenue. Courtright also argued that the government had not presented sufficient evidence of TGC's insolvency. In other words, Courtright argued, the government failed to prove that he operated a "scheme or artifice to defraud" as required under 18 U.S.C. § 1343. The district court reserved ruling on the oral motion. Courtright made his second motion in writing after the jury verdict, arguing again that he was not involved in a scheme to defraud. Specifically, he argued that: (1) the jury had insufficient evidence to conclude that TGC was insolvent; (2) the government did not trace transfers of specific site partners'

funds to another identified site partner; and (3) the CPA draw provision permitted the transfer of upfront fees. The court denied the motion. We review Rule 29 motions de novo. We will reverse a district court's denial "only if, viewing all evidence in a light most favorable to the government, we conclude that no rational trier of fact could have found the defendant guilty." *United States v. Harris*, 51 F.4th 705, 714 (7th Cir. 2022).

Courtright makes two arguments for acquittal on appeal. First, he argues that there was insufficient evidence to conclude that he participated in a scheme to defraud by deliberately misrepresenting facts or making false promises. Second, he argues for the first time that there was insufficient evidence to establish the requisite intent to defraud at trial. We address each argument in turn.

### A. Scheme to Defraud

The wire fraud statute states, in relevant part:

> Whoever having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343. To prove a scheme to defraud, the government needed to present sufficient evidence that "the defendant made or was responsible for a 'material false statement, misrepresentation, or promise, or concealed a material fact.'" *United States v. Filer*, 56 F.4th 421, 428 (7th Cir. 2022)

(quoting *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016)). At trial, the government alleged that Courtright falsely stated both that upfront fees would not be used for monthly investor payments and that TGC was in good financial standing.

The government met its burden as to both statements. *Id.* at 425. First, on the upfront fees, prosecutors presented testimony from site partners that Courtright stated he would use their upfront fees exclusively for the purchase, hosting, maintenance, and marketing of websites as permitted under the CPAs. Two different site partners also testified that Courtright told them that TGC would use revenue from better performing websites to make monthly payments to site partners with under-performing websites and did not identify any other funding sources for monthly payments. This representation was directly contradicted by TGC's financial records and testimony from TGC's controller, TGC's accountant, and the FBI's forensic accountant stating that the company used upfront fees to pay investors.

This same testimony was also sufficient to establish the falsity of the statements about TGC's financial health. Recall that the CPAs guaranteed that TGC was "in satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties." At the same time, the government presented evidence that TGC never generated sufficient revenue during the charged scheme—setting aside funds generated from upfront fees—and thus was forced to take out substantial loans with onerous repayment terms to meet its financial obligations to investors. This evidence, coupled with the testimony from the controller, accountant, and forensic accountant, establishes that Courtright

oversaw the unauthorized usage of upfront fees, and paints a portrait of a company in financial distress, not satisfactory financial condition.[2]

Every site partner who testified also emphasized that the use of their upfront fees and the sources of funding for their monthly payments was material to their decision to invest. This testimony satisfies the long-standing definition that a false statement is material if it "'has a natural tendency to influence, or [is] capable of influencing, the decision of' the decision making body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (quoting *Weinstock v. United States*, 231 F.2d 699, 701 (D.C. Cir. 1956)). Courtright's false statements go to the core of the investors' bargain with TGC: how TGC would spend investment capital, how investors would be paid, and the financial viability of the entire enterprise.

Contrary to Courtright's arguments on appeal, *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), does not support the opposite conclusion. Weimert initially was convicted of wire fraud for cutting himself in on a real estate transaction during the height of the 2008 financial crisis. *Id.* at 353.

---

[2] The government was not required, as Courtright argues, to present testimony on the meaning of the contractual terms in the CPAs, namely "solvent," "unable to pay its bills," or "satisfactory financial condition." Expert witness testimony was unnecessary because the terminology did not require specialized knowledge to understand. *See United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019) ("If the matter is within the jurors' understanding, the expert testimony is not 'specialized knowledge' that 'will help the trier of fact,' as required by Federal Rule of Evidence 702."). A jury of "common understanding" would be entitled to parse the contractual language's ordinary meaning. *Id.*

Weimert told two negotiating financial institutions that the other institution would not do the deal unless he received a stake in the sale. *Id.* at 360–62. The conviction was ultimately overturned on appeal because, though Weimert's conduct was "sharp and self-interested," the "final contract terms were in plain view and were in fact discussed and negotiated by the interested parties." *Id.* at 370; *see also id.* at 364 (noting that "[a]ll terms of the transaction, including Weimert's participation as a buyer, were disclosed to all interested parties"). Said another way, there was no "deliberate misrepresentation of facts or false promises." *Id.* at 357. Courtright argues that his conviction ought to be overturned like Weimert's because he disclosed TGC's financial position through a moratorium letter to investors in 2019.

Our court has warned litigants against "read[ing] too much into *Weimert*'s narrow holding." *Filer*, 56 F.4th at 430. As we clarified in *Filer*, *Weimert* merely stands for the proposition that, while "sophisticated businesspeople are expected to hide their true goals, values, priorities, or reserve prices from their negotiating partners," they are not permitted to obfuscate material information. *Id.* at 431 (citation modified). Unlike the information at issue in *Weimert*, TGC's financial condition and adherence to strict operating procedures concerning collected fees were highly material.

Even setting *Weimert*'s limited applicability aside, the moratorium letter does not help Courtright's case. Unlike the contractual terms in *Weimert* which clearly spelled out each party's rights and obligations, the moratorium letter failed to clearly disclose the problems TGC was facing. The letter simply stated that TGC was experiencing new "challenges and headwinds" and asked site partners for a four-month

moratorium on guaranteed payments. It never mentioned the company's usage of upfront fees, let alone its long-standing financial problems. Given these distinctions, acquittal on this ground is not justified.

## B. Intent to Defraud

Courtright next argues for the first time that there was insufficient evidence for the jury to conclude that he intended to defraud investors.

Because Courtright did not raise this argument in his oral or written Rule 29 motion to the district court, we must pause to consider our ability to review the argument. "A motion under Rule 29 that makes specific arguments waives issues not presented, but a general motion preserves every objection." *United States v. Maez*, 960 F.3d 949, 959 (7th Cir. 2020).[3] The government argues that Courtright waived his intent argument by failing to present it to the district court, and waiver precludes appellate review. *See United States v. Knox*, 540 F.3d 708, 713 (7th Cir. 2008). Courtright answers that he merely forfeited the argument, thereby preserving it for plain error review on appeal. *See id.* Ultimately, "we need not choose between waiver and forfeiture because the [defendant] has not shown plain error." *United States v. Jones*, 713 F.3d 336, 350–51 (7th Cir. 2013).[4]

---

[3] We have expressed concern about the "perverse incentives [this rule] sets up to dissuade defendants from making specific arguments in a Rule 29 motion." *United States v. Rivers*, 108 F.4th 973, 978 n.1 (7th Cir. 2024).

[4] Courtright maintains that plain error review applies, but suggests that we review his argument de novo. As he points out, our court has "at times applied de novo review to legal questions wrapped up in challenges to the sufficiency of the evidence, even when the specific legal argument

On plain error review, we will reverse a district court's decision where there is "an obvious error affecting [the defendant's] substantial rights and seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *United States v. Groce*, 891 F.3d 260, 270 (7th Cir. 2018); *see also United States v. Olano*, 507 U.S. 725, 733–35 (1993).

Courtright argues that the district court plainly erred because his conduct—particularly issuing the moratorium letter, mandating that the company be annually audited, hiring a certified fraud examiner, candidly discussing TGC's financial condition with the incoming CEO, and disclosing the cash advance loans' onerous terms—did not indicate an intent to defraud. In urging us to find the evidence of intent insufficient, Courtright points us to *United States v. Domnenko*, 763 F.3d 768 (7th Cir. 2014). We are not persuaded.

In *Domnenko*, a husband and a wife committed wire fraud in the purchase and eventual sale of a residential home. *Id.* at 770. The company that owned the home, of which the husband was a partner, sold the home to the wife for $250,000 above market value. *Id.* The husband then pocketed that additional $250,000 from the sale proceeds. *Id.* The couple later sold the house to a buyer whom they enticed with a kickback from the sale proceeds. *Id.* Neither the husband nor the wife disclosed the conflict attending the first sale, the inflated purchase price, the husband's receipt of the $250,000, or the kickback to the buyer in the second sale despite having an obligation to do so in closing documents. *Id.*; *see also id.* at 773 (citing

---

was not presented to the district court." *Rivers*, 108 F.4th at 978 (collecting cases). But that result does not follow here because Courtright does not raise a pure legal argument on appeal.

*United States v. Powell*, 576 F.3d 482, 491 (7th Cir. 2009)). Our court affirmed the conviction over a sufficiency challenge to the defendants' intent to defraud because there was "strong circumstantial evidence that the Domnenkos planned and plotted together from the very beginning." *Id.* at 773. This evidence included the defendants' drafting of false documents and their coordinated obfuscation of the conflict their relationship presented. *Id.* at 773–74.

From this, Courtright suggests that there was insufficient evidence to convict him because there was no evidence, as there was in *Domnenko*, that he "plotted" to defraud investors. But the standard is not so rigid. Because direct evidence of intent is often undiscoverable, "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Pust*, 798 F.3d 597, 600–01 (7th Cir. 2015) (citation modified).

Viewed in the light most favorable to the government, the evidence at trial more than cleared the *Pust* standard. The government presented witness testimony (including through Courtright's cross-examination) and other evidence that was sufficient to establish Courtright's intent. That evidence showed that Courtright knowingly told investors a falsehood: their upfront fees would not be used to pay other site partners. TGC's accountant testified that he notified Courtright that upfront fees were being used to pay investors, yet the practice continued for years. The evidence establishing the perpetual shortfall in revenue was overwhelming—TGC's accountant and controller both discussed the insufficiency of that revenue stream at length, and the forensic accountant

bolstered the credibility of those assertions. Even Courtright testified several times on cross-examination that he used investors' upfront fees to make the guaranteed minimum monthly payments in violation of the CPAs.

Additionally, much of the district court's reasoning rejecting the "scheme to defraud" arguments in Courtright's written Rule 29 motion applies with equal force to his new intent argument on appeal. *See United States v. Courtright*, No. 20 CR 77, 2023 WL 8934999, at *1–4 (N.D. Ill. Dec. 27, 2023). The court ultimately denied the written motion, finding that the government established that "Mr. Courtright approved, authorized, and directed the use of the contractual language that promised the guaranteed, perpetual returns … *knowing full well* that the company could not fulfill the extravagant promises it had made." *Id.* at *3 (emphasis added). The court relied upon much of the trial evidence discussed earlier to support its finding, namely: (1) the defendant's own knowingly untruthful representations to investors about the limitations on the upfront fees and TGC's financial health; (2) corporate ledgers establishing that "there was *never* anywhere near enough revenue from website income to make the guaranteed monthly payments to investors"; and (3) testimony from the forensic accountant and others establishing TGC's insolvency. *Id.* at *1–3.

In sum, the district court did not err, let alone plainly err, by finding the evidence sufficient to affirm the jury's verdict. For that reason, we affirm the court's denial of the Rule 29 motion.

## III.

Our final task is to address Courtright's sentencing challenge. Courtright argues that the district court made two errors during his sentencing hearing. First, he says, the court failed to engage in a required causation analysis when determining the loss amount. Second, he asserts, the court should have reduced the loss amount by the amount TGC spent on operating costs during the charged period. As explained below, we conclude that Courtright has waived the first argument and cannot succeed with the second.

### A. Causation Analysis

Sentencing Guideline Section 2B1.1(b)(1)(C)(i) defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." "[D]etermining whether loss was reasonably foreseeable requires causation analysis." *United States v. Burns*, 843 F.3d 679, 688 (7th Cir. 2016). And that analysis looks for both but-for causation and proximate causation. *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006). Our court has remanded cases where a district court failed to apply or improperly applied the causation analysis. *See id.* at 801–02; *Burns*, 843 F.3d at 688–89; *Domnenko*, 763 F.3d at 775–77.

Normally, "procedural challenges to a criminal sentence are reviewed de novo." *United States v. Martin*, 109 F.4th 985, 988 (7th Cir. 2024) (citation modified). The same is generally true even if the defendant did not object to the issue at sentencing. *See id.* at 289 ("When the error is created by the district court's ruling itself, however, a defendant is not required to contemporaneously object to the error to preserve it for de novo review.") (citation modified). Nevertheless, our court

has long held that a litigant who makes a "knowing and intentional decision not to assert a right" waives the issue and strips this court of the ability to review the decision. *United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009) (citation modified). Said another way, an issue is waived if it is clear that "a defendant chose, as a matter of strategy, not to present an argument." *Id.*

The government argues that, although the district court did not undertake the complete causation analysis, Courtright waived this argument below. We agree. It is clear from the record that Courtright's counsel unambiguously accepted the government's loss calculation of $69.3 million when he stated that "there is agreement, obviously, to the 69.3." It is also clear that this was a strategic choice by counsel. After successfully advocating for the lowest proposed loss amount, counsel asked the district court to adopt several deductions. The court granted two of the four proposed deductions, and this benefited Courtright greatly. The final loss amount was below the $65 million threshold, so Courtright's offense level increased by 22 levels rather than the possible 24. *See* U.S.S.G. § 2B1.1(b)(1). While "[t]he line between waiver and forfeiture is often blurry," this record definitively establishes that counsel intended to forego any causation argument and thereby waived the challenge entirely. *Garcia*, 580 F.3d at 541.

## B. Deductions Sought

We must finally consider whether the district court erred by declining to deduct $42 million in TGC's operating expenses from the loss amount. A district court's loss calculation is a factual determination, and we therefore review for clear error. *United States v. Collins*, 949 F.3d 1049, 1053 (7th Cir. 2020). Courtright "bears a heavy burden" on appeal because

he must establish that "the court's loss calculations were not only inaccurate but outside the realm of permissible computations." *Id.* (citation modified). We have held that "[l]oss cannot include the value of services a defendant legitimately performed for the victims of his fraud." *United States v. Swanson*, 483 F.3d 509, 513 (7th Cir. 2007). Although it is sometimes difficult to distinguish between legitimate and illegitimate services, "a common thread in those cases is that services are legitimate when the victim agreed to pay for them." *United States v. Betts-Gaston*, 860 F.3d 525, 540 (7th Cir. 2017).

The district court did not commit clear error by denying this deduction. Courtright is correct that the CPAs authorized TGC to use upfront fees for maintenance costs. At the same time, the CPAs also stipulated that investors' funds could only be put toward their own websites. So, even though it is true that TGC was permitted to use upfront fees for each individual website's maintenance costs, there is no evidence in the record that TGC did in fact use the fees that way. Rather, the evidence points in the opposite direction: TGC appeared to commingle all company funds. In laying the groundwork for the deduction he sought, Courtright did not present the district court with a workable way of determining how much, if any, of the upfront fees were spent in accordance with CPA terms. Accordingly, the district court did not clearly err in denying the massive proposed deduction.

AFFIRMED.